740 A.2d 180

**COMMONWEALTH of Pennsylvania, Appellee,**

**v.**

**Jesse WALKER, Appellant.**

Supreme Court of Pennsylvania.

Submitted Jan. 12, 1999.

Decided Oct. 25, 1999.

Vincent Roggio, for Jesse Walker.

Catherine Marshall, Philadelphia, for Com.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION

ZAPPALA, Justice.

Jesse Walker appeals from the judgment of sentence imposed following his conviction of robbery, conspiracy, and violation of the Uniform Firearms Act. He argues that the trial court committed reversible error in precluding defense counsel from cross-examining the complainant, Wilbur Pittman, regarding the fact that Pittman was on parole at the time he first identified Walker as the perpetrator to the police,

and at the time he identified Walker at the preliminary hearing. We affirm the judgment of sentence.

Pittman testified at trial that he was sitting watching television at about 10:30 p.m. when his doorbell rang. He looked through the peephole and saw Walker, whom he recognized from the neighborhood. When he opened the door, Walker pushed him to the floor, held a gun to his head, and started going through his pockets. At the same time, a companion, who was also armed with a gun, went into Pittman's apartment. Walker then forced Pittman into the living room. While Walker ransacked the bedroom, the accomplice held Pittman at gunpoint in the living room, then tied his hands behind his back with a telephone cord. The two men took Pittman to the basement and locked the door. He was freed when a woman who had been at his apartment earlier in the evening returned, found his front door open, and heard him call to her from the basement.

Pittman called the police. The officer responding to the dispatch took a description of the perpetrators from Pittman for immediate broadcast over police radio. He then arranged for a tow truck to take Pittman's car to a garage, because the keys to the car were in a jacket the robbers had taken and Pittman was concerned that they might return to take the car. Shortly before midnight, the officer took Pittman to be interviewed by detectives.

The following Monday, Detective Edward Furlong, who was assigned to investigate robberies in the area, contacted Pittman and arranged to meet him at his house. Pittman described the incident and showed Furlong the living room and basement areas where it happened. He also told Furlong that he would be able to identify one of the men because he had seen him in the neighborhood before. In the course of the next few weeks, Pittman called and left messages for Furlong advising that he had found out that the man he recognized was nicknamed "Pooch," that he had seen the man in the neighborhood again, and that he knew where Pooch's mother lived. Through further investigation, Furlong connected the name Pooch with Jesse Walker. Thereafter, he showed Pittman a

photo array and Pittman identified Walker as one of the men who had robbed him. Using all of this information, Furlong obtained an arrest warrant on March 22 nd and arrested Walker two days later.

Walker presented a witness who testified that she was with Walker and another man, since deceased, at a local bar throughout the entire evening in question. Walker also presented Valerie Lane, whom Pittman identified as the woman who had been in his home that evening and who had released him from the basement. Lane gave a different version of the events. She testified that Pittman ran a speakeasy in his home and that she was there having a beer when two masked men forced their way in. The two asked Pittman for his money and his liquor. They also asked Lane for her money, but let her leave when she said she didn't have any. Lane walked a few blocks and waited for a bus, but decided to return after seeing the men walk away from the house carrying several boxes. Upon returning, she discovered Pittman and another man who had been in the house tied up in the basement.

Just before the trial commenced, the Commonwealth made a motion in limine to preclude defense counsel from eliciting any testimony or otherwise making reference to the fact that Pittman had been on parole at the time of the incident and at the time of the preliminary hearing. The prosecutor asserted that the parole had expired several months earlier and thus Pittman was no longer "under the influence of the Commonwealth." N.T. 11/10/93 at 3. Defense counsel responded that such evidence would be admissible in the trial court's discretion under Federal Rule of Evidence 609, and made reference to language in *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), about the "important function of . . . the right to cross-examination." N.T. 11/10/93 at 4. An off-the-record discussion was held in which defense counsel apparently related the issue of Pittman's parole status to the theory that Pittman had been running a speakeasy at the time of the robbery. Following the off-the-record discussion, the transcript resumes with the court stating in summary fashion, "If

I may, if the probative value is that there's a gentleman who's on parole at the time and is running an illegal speakeasy and does not want the police coming to his house in an investigation crime, he wants to get the case over with and says this is the guy that did it. . . ." *Id.*

The court was interrupted by a brief argument between counsel and then concluded by granting the Commonwealth's motion, stating that Pittman's parole status at the time of the incident and preliminary hearing had no probative value. The court distinguished *Davis v. Alaska* on the basis that the witness in *Davis* was on probation for a juvenile adjudication arising out of a burglary at the time he was interviewed by police about a safe that had been stolen from a bar and found near the witness's house. The court noted the "connection or probative value between the conviction of the juvenile and the nature and trial of the defendant." *Id.* at 7.

In his post-verdict motion, again citing *Davis v. Alaska,* Walker argued that the evidence of Pittman's parole status goes directly to the credibility of the witness and his bias to cooperate and concur with the police, representatives of the Commonwealth. A parolee may have many reasons for being untruthful in the report of a crime, his account to the police, and his testimony at the preliminary hearing and at trial. The jury should have been made aware of the fact that the complainant was on parole and the defendant should have been able to confront the witness with this fact for the jury to determine credibility.

The court again rejected this argument, noting that "there was no offer of proof of a nexus between Complainant's conduct at the scene or circumstances of the arrest to establish probative value to such testimony." Opinion at 3. Quoting from *Davis,* the court concluded that it had "exercised its discretion properly by its determination that evidence of the Complainant's parole status was not 'necessary for a fair determination of the issue of guilt or innocence.' " *Id.*

The Superior Court's consideration of the issue was substantially more in depth, going beyond simple citation to *Davis*

and analyzing Pennsylvania cases in some detail. The court began by citing *Commonwealth v. Evans*, 511 Pa. 214, 512 A.2d 626, 632 (1981), as holding that "Article One Section Nine of the Pennsylvania Constitution entitles a defendant 'to challenge a witness's self-interest by questioning him about possible or actual favored treatment by the prosecuting authority in ... any ... non-final matter involving the same prosecuting authority.'" Memorandum Opinion at 4. The court went on to examine *Commonwealth v. Nolen*, 535 Pa. 77, 634 A.2d 192 (1993), in which we held it was error to preclude defense counsel from cross-examining a witness about the fact that various charges were pending against him both in Pennsylvania and Virginia at the time he agreed to testify for the Commonwealth, although not at the time of trial. The Superior Court distinguished *Nolen*, however, by observing that the reason the witness's cases were no longer pending when he was called to testify at Nolen's trial was that they had been resolved in the witness's favor, the Virginia charges by dismissal and the Pennsylvania charges by payment of a fine to a reduced offense. The potential for bias continued beyond the closure of those cases, and thus remained a proper subject of cross-examination, since the favorable resolutions might have been related to the witness's agreement to testify.

Instead of *Nolen*, the court considered *Commonwealth v. Murphy*, 527 Pa. 309, 591 A.2d 278 (1991), to be controlling. In *Murphy*, the question was whether counsel provided ineffective assistance in failing to cross-examine two Commonwealth witnesses for bias. Wanda Wilson was on juvenile probation at the time of trial. Maurice Graves had just completed a term of juvenile probation. The focus of the opinion in *Murphy* was counsel's handling of Wilson. We described counsel as "abysmally ignorant of the law regarding the proper method of cross-examining a child witness who is on juvenile probation." 591 A.2d at 278. This was because counsel considered only the possibility of whether the juvenile adjudications could be used as crimen falsi to impeach the witnesses, which was plainly not allowable under *Commonwealth v. Katchmer*, 453 Pa. 461, 309 A.2d 591 (1973). He

gave no consideration to the type of argument made in *Davis v. Alaska* that the adjudications might have given the witnesses an ulterior motive for giving testimony favorable to the Commonwealth's case.

It was the discussion with respect to Graves, however, that the Superior Court found controlling in this case. The opinion in *Murphy* stated that the "*Davis* argument as to Graves is without merit because Graves' juvenile probation had expired before trial." 591 A.2d at 280. The Superior Court emphasized this language and observed that in the present case, "the victim's probation [sic] had expired before trial. Hence, no potential or likelihood of bias could have existed for his testimony at trial. Having completed his term of probation before trial, the victim was, so to speak, 'off the hook'. His testimony was not motivated by fear of probation revocation for violating the terms and conditions thereof by operating a speakeasy." Memorandum Opinion at 7.

Walker correctly argues that the Superior Court misread *Murphy*. The court failed to acknowledge a footnote appended to the statement from *Murphy* quoted above, which indicated that it is was unclear from the record when Graves's probation had expired, but that if Graves "was on probation the second time he was interviewed by the police when he identified Appellant as the man he saw running away from the scene of the crime ... he would be subject to a *Davis* cross-examination." 591 A.2d at 280 n. 1. Although it was dictum, the footnote plainly stated the view that bias arising out of probationary status at a time prior to trial may be a proper subject of cross-examination. In light of this substantial qualifying consideration, *Murphy* does not embody the proposition for which the Superior Court cited it and which the Commonwealth argues in its brief.

The Commonwealth also argues that this case is controlled by *Commonwealth v. Rainey*, 540 Pa. 220, 656 A.2d 1326 (1995). That case, however, involved a claim that trial counsel was ineffective for failing to request a jury instruction concerning the potential bias of a Commonwealth witness. Michael Rainey, George Williams, and Alvin Morgan developed a

plan to rob an elderly man and were on their way to his house, when they encountered Kevin Lewis, the witness in question. Rainey was armed with a shotgun. Williams indicated that he was going to collect a debt, and Lewis gave him an inoperable gun to use as a threat. Ultimately, while Morgan acted as a lookout, Williams and Rainey accosted the man and Rainey shot him in the back. In exchange for his testimony, Morgan pled guilty to third degree murder and was awaiting sentencing at the time of trial.

It appears that Lewis gave a statement to police in which he identified Rainey and Williams. Sometime thereafter he was adjudicated delinquent on an unrelated matter and was in detention when he gave a second statement, again identifying Rainey and Williams. Following his release from juvenile detention he was interviewed a third time. Once more he identified Rainey and Williams, but for the first time he also admitted that he had given Williams the inoperable handgun.

Citing *Commonwealth v. Borders*, 522 Pa. 161, 560 A.2d 758 (1989), Rainey argued that because Lewis was in detention at the time of his second statement, counsel was ineffective for not requesting a jury instruction regarding Lewis's potential bias. We rejected this argument, stating that it

completely ignores the fact that at the time of trial and at the time of his third statement, Lewis had already served his juvenile detention, and was no longer subject to bias from this perspective. Thus, appellant's claim is without arguable merit. In fact, the Commonwealth correctly notes that Lewis's statement was particularly reliable because he had admitted giving a handgun to Williams; therefore, exposing himself to criminal prosecution at a time when he had no juvenile (or other) cases pending.

656 A.2d at 1333.

Although the foregoing language might be taken to suggest that the timing of the detention or probation is the determinative factor, we cannot ignore the fact that the issue of witness bias was raised in entirely different contexts in *Borders* and *Rainey*. In *Borders*, the defendant was precluded from ex-

ploring the possibility that the witness was biased in favor of the prosecution because charges were pending against him at the time of trial. In *Rainey*, the evidence relevant to the matter of bias was in the record. The defendant argued that counsel should have asked the court to instruct the jury concerning Lewis's potential bias. Such an instruction would have been inappropriate, however, since the alleged bias did not relate to Lewis's testimony at trial. Although counsel would have been free *to argue to the jury* that Lewis's second statement to the police was tainted by an ulterior motive arising out of his juvenile detention, there was no basis for the court *to instruct the jury* that Lewis's testimony at trial might be tainted in the same way.

Having determined that neither *Murphy*, which the Superior Court found controlling, nor *Rainey*, which the Commonwealth relies on, is dispositive, we must consider the question in light of the reasoning underlying the various decisions involving cross-examination of a witness for bias. As previously noted, in *Commonwealth v. Evans* we recognized that a defendant's entitlement to challenge a witness's self-interest is rooted in the confrontation clauses of the state and federal constitutions. Notwithstanding this constitutional dimension, we have also recognized that the issue is essentially an evidentiary ruling regarding "the scope and manner of cross-examination [which is] within the sound discretion of a trial judge whose decision[ ] will not be overturned absent an abuse of discretion." *Commonwealth v. Auker*, 545 Pa. 521, 681 A.2d 1305, 1317 (1996). See also, *Borders*, 560 A.2d at 760 ("the better course . . . is to favor the defendant's ability to fully and freely challenge the testimony and evidence of the prosecution with whatever tools are at his disposal, *so long as that use can be justified by an offer of relevance at the proceedings*.") (Emphasis added.)

In *Borders*, the witness whom the defendant sought to cross-examine was the complainant. Borders and a codefendant were charged with aggravated assault and conspiracy for the stabbing of Mark Rideout. Rideout apparently had a substantial record of juvenile offenses. At the time of trial,

two charges were pending against him for an arrest or arrests made after he had been stabbed and identified Borders as the perpetrator. The trial court ruled that Borders could not examine Rideout about the pending charges to establish bias. We reversed, rejecting the Commonwealth's argument that there could be no inference of bias because the charges at issue arose after Rideout reported the stabbing and identified the perpetrator. After characterizing the desired cross-examination as "an attempt to show that the victim has some *ulterior motive for continuing his role as an accuser* due to subsequent acts, bringing him into the sphere of influence of the prosecutor," 560 A.2d at 760, we concluded that "[t]he presence of the charges ostensibly brought the witness into the influence of the prosecution, for better or worse, and that happenstance was a relevant area of exploration by Appellant...." *Id.*

*Commonwealth v. Simmon*, 521 Pa. 218, 555 A.2d 860 (1989), was an earlier case in which the witness in question was the complainant. The defendant, Grace Simmon, was charged with aggravated assault, recklessly endangering another person, and possession of an instrument of crime arising out of a fight with the complainant, Rochelle Hood, in which Hood was stabbed in the chest. Hood testified that she was unarmed and was attacked without provocation by Simmon. Simmon testified that Hood, who had previously threatened her with a knife, instigated the fight by hitting Simmon with her fist. Acting out of fear because of Hood's previous threats, Simmon drew her own knife in self-defense.

Prior to trial, the common pleas court denied a defense request to examine Hood's juvenile record for potential use on cross-examination to show bias. After the Superior Court affirmed the judgment of sentence, we granted allocatur to examine Simmon's claim that the court erred in denying access to Hood's record. Observing that a witness's juvenile probationary status was relevant to show bias regardless of the fact that the witness was the complainant, we reversed

and remanded to the trial court for review of Hood's juvenile record *in camera*. In rejecting the Commonwealth's argument that since Hood was the victim her probationary status could not be used to influence her testimony, we noted:

> The threat of revocation, no matter how subtle, based on a violation of a probation condition (i.e. not engaging in assaultive behavior) always can be used by the prosecution to ensure cooperation. Indeed, it might precede the prosecutor's involvement by providing the motivation for the complainant to report that she had been assaulted. Were Hood the aggressor and Simmon the victim, assuming she were on probation, it would benefit Hood to report her wound as though she were the victim, thus deflecting any inquiry that might jeopardize her probation.

555 A.2d at 863 n. 4.

As previously noted, in the present case defense counsel made only a very general offer of proof as to the possible probative value of the fact that Pittman had been on parole at the time of the incident, which was tied to the suggestion that Pittman was operating a speakeasy in his home when he was robbed. According to this theory, Pittman might have had an ulterior motive to cooperate with the police to avoid being charged with a probation violation for this illegal activity.

This argument resembles the suggestion in *Simmon* that the probationer might have been motivated to report a fight and claim the status of victim in order to preempt suspicion that she was the aggressor. However, in this case the nature of the incident is such that we can perceive no advantage to Pittman from reporting that he was the victim. Unlike the fight in *Simmon*, it is inconceivable that Pittman might be prompted to go to the police with his version of the event first for fear that the other party or parties involved in a robbery might report the incident in such a way as to jeopardize Pittman's parole. Furthermore, if Pittman were concerned about police discovering an illegal speakeasy and citing him

for a parole violation, he would simply have refrained from reporting the robbery and summoning the police to his home in the first place. Finally, Appellant's argument on appeal overlooks the fact that the court permitted counsel to question witnesses about the allegation that Pittman operated a speak-easy and to argue to the jury that the desire to get the case over with motivated Pittman to cooperate with the police and identify Jesse Walker. Appellant fails to establish how the fact that Pittman was on parole would have added to this argument.[1]

For the foregoing reasons, we hold that the trial court did not abuse its discretion in concluding that Appellant failed to make an adequate offer of proof regarding the probative value of Pittman's parole status when he was robbed and when he first identified Appellant as the perpetrator. Accordingly, the order of the Superior Court affirming the judgment of sentence is affirmed.

Justice CAPPY concurs in the result.

---

1. Appellant also argues that because Pittman did not initially tell the police that he recognized the robber from the neighborhood, and this "crucial fact" only emerged through subsequent contact with the police, Appellant should have been able to bring to the jury's attention the fact that Pittman was vulnerable as a parolee at the time of those communications with the police. It appears that this argument in support of the probative value of Pittman's parole status is raised for the first time in this appeal. Moreover, it proceeds from a premise that is contradicted by the record. Both Pittman and the officer who responded to the call testified that Pittman told the officer that he recognized the perpetrator from the neighborhood.