J-S46039-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| BARBARA ROGERS | : | |
| | : | |
| Appellant | : | No. 3048 EDA 2019 |

Appeal from the Judgment of Sentence Entered June 10, 2019
in the Court of Common Pleas of Monroe County
Criminal Division at No(s): CP-45-CR-0002045-2017

BEFORE: BENDER, P.J.E., SHOGAN, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:          **FILED FEBRUARY 23, 2021**

Barbara Rogers ("Rogers") appeals from the judgment of sentence entered following her conviction of third-degree murder.[1] We affirm.

In the early morning hours of July 15, 2017, Rogers and her boyfriend, Stephen Mineo ("Mineo"), were in the studio apartment they shared together in Coolbaugh Township, Monroe County, when Rogers placed Mineo's handgun against Mineo's forehead and shot him once, killing Mineo. Twenty minutes after the shooting, Rogers called 911. Corporal Steven Mertz ("Cpl. Mertz") and Detective Corporal Lucas Bray ("Detective Bray") of the Pocono Mountain Regional Police Department ("PMRPD") responded to the shooting. They subsequently transported Rogers to police headquarters for questioning.

_____

[1] 18 Pa.C.S.A. § 2502(c).

During her interviews, Rogers was advised several times of her rights under **Miranda**,[2] and Rogers executed several written waivers of her **Miranda** rights. During the interviews with Detective Bray and Detective John Bohrman ("Detective Bohrman"), Rogers disclosed that she had been in the United States Army for eight years before being discharged for medical reasons; she suffered from bi-polar disorder, but was not currently on her medication; and she owned a handgun, for which she had a permit, and which she stored in the apartment. Further, Rogers disclosed that she and Mineo were members of a religious cult. Rogers stated that she and Mineo had recently become upset with the leader of the cult, who believed that Rogers was actually a reptile. Rogers's and Mineo's issues with the cult had caused tension in their relationship. Rogers also stated that she killed Mineo because Mineo wanted her to kill him, and that she was under a large amount of stress due to the issues with the cult.

Rogers was charged with criminal homicide in connection with the shooting. On February 26, 2018, Rogers filed a pre-trial Motion to suppress her statements to police, which the trial court denied following a hearing. Rogers proceeded to a jury trial, which took place from March 27-29, 2019. At trial, the jury acquitted Rogers of first-degree murder, and convicted her of third-degree murder.

---

[2] **Miranda v. Arizona**, 384 U.S. 436 (1966).

Following the preparation of a pre-sentence investigation report ("PSI"), the trial court sentenced Rogers to fifteen to forty years in prison. Rogers filed timely post-sentence Motions, in which she requested reconsideration of sentence, and requested a new trial on four grounds: (1) the verdict was against the weight of the evidence; (2) the trial court improperly refused to charge the jury on involuntary manslaughter; (3) the trial court improperly ruled that Rogers could not offer a defense of diminished capacity without also admitting criminal liability; and (4) the trial court improperly denied her pre-trial Motion to suppress. Following a hearing, the trial court denied Rogers's post-sentence Motions. Rogers filed a timely Notice of Appeal, and a court-ordered Pa.R.A.P. 1925(b) Concise Statement of matters complained of on appeal.[3, 4]

Rogers raises the following issues for our review:

1. Did the [trial] court abuse its discretion and commit reversible error when the [trial] court did not allow the charge of involuntary manslaughter to go to the jury[,] because involuntary manslaughter is a lesser[-]included offense of murder, and because the evidence would support an involuntary manslaughter

---

[3] Rogers purports to appeal from the trial court's denial of her post-sentence Motions. However, "[i]n a criminal action, appeal properly lies from the judgment of sentence made final by the denial of post-sentence motions." **Commonwealth v. Shamberger**, 788 A.2d 408, 410 n.2 (Pa. Super. 2001) (*en banc*) (citation omitted). We have corrected the caption accordingly.

[4] By Order dated June 17, 2020, this Court dismissed Rogers's appeal for failure to file an appellate brief. Rogers filed a Petition to reinstate the appeal, and on July 13, 2020, this Court issued an Order reinstating Rogers's appeal.

verdict whenever it would support a murder or involuntary manslaughter verdict?

2. Did the [trial] [c]ourt abuse its discretion and commit reversible error by not suppressing [Rogers's] statements from the scene and at [PMRPD] where, because of her mental state, she was not in a position psychologically and emotionally to provide a reliable and trustworthy statement and understand the waiver of *Miranda*?

3. Did the [trial] [c]ourt abuse its discretion and commit reversible error [by imposing] a sentence that was unduly harsh and [by failing] to properly consider the mitigating factors of her military service and her bi-polar disability?

4. Did the [trial] [c]ourt abuse its discretion and commit reversible error by not setting aside the verdict of [c]riminal [h]omicide-[m]urder in the third [d]egree because it was against the sufficiency of the evidence?

5. Did the [trial] [c]ourt abuse its discretion and commit reversible error by not setting aside the verdict of [c]riminal [h]omicide-[m]urder in the third [d]egree because it was against the weight of the evidence?

Brief for Appellant at 5 (renumbered).

Rogers first argues that the trial court erred in failing to grant her request for a jury instruction on involuntary manslaughter.[5] *Id.* at 10. Rogers claims that the trial court's refusal to instruct the jury on involuntary manslaughter "basically shut out the defensive strategy of [Rogers]," as Rogers had cross-examined witnesses under a theory that Rogers had accidentally shot Mineo. *Id.* Rogers asserts that such an instruction was appropriate, as she had failed to perceive the risk that shooting Mineo would

---

[5] 18 Pa.C.S.A. § 2504(a).

have caused, and because the shooting was an "unlawful act that happened in a reckless manor [*sic*]." *Id.* at 13-14.

> In reviewing a challenge to the trial court's refusal to give a specific jury instruction, it is the function of this Court to determine whether the record supports the trial court's decision. In examining the propriety of the instructions a trial court presents to a jury, our scope of review is to determine whether the trial court committed a clear abuse of discretion or an error of law which controlled the outcome of the case. A jury charge will be deemed erroneous only if the charge as a whole is inadequate, not clear or has a tendency to mislead or confuse, rather than clarify, a material issue. A charge is considered adequate unless the jury was palpably misled by what the trial judge said or there is an omission which is tantamount to fundamental error. Consequently, the trial court has wide discretion in fashioning jury instructions. The trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not require reversal unless the [a]ppellant was prejudiced by that refusal.

*Commonwealth v. Thomas*, 904 A.2d 964, 970 (Pa. Super. 2006) (internal citations, quotation marks, and brackets omitted).

Pursuant to Section 2504 of the Crimes Code, involuntary manslaughter involves "the doing of an unlawful act in a reckless or grossly negligent manner or the doing of a lawful act in a reckless or grossly negligent manner." 18 Pa.C.S.A. § 2504(a). "[I]n a murder prosecution, an involuntary manslaughter charge shall be given only when requested, where the offense has been made an issue in the case and the trial evidence reasonably would support such a verdict." *Commonwealth v. Banks*, 677 A.2d 335, 343 (Pa. Super. 1996).

In its Opinion, the trial court addressed this issue as follows:

> The facts in evidence at trial … do not reasonably support a finding of involuntary manslaughter. [Rogers] confessed to firing the fatal shot, telling Detectives Bohrman and Bray that she knew the gun was loaded, she intentionally pulled the trigger, she knew a bullet would come out, and she knew [Mineo] wanted to die. Further, the evidence, from [Rogers]'s own demonstration, showed that [Rogers] was standing over [Mineo] in an isosceles shooting stance with the gun aimed at a downward angle at the forehead of [Mineo,] who was sitting cross-legged on the floor. This evidence[,] together with the evidence relating to how the gun was fired and the gunshot wound itself does not align with an accidental death or gross negligence on the part of [Rogers] as required for an involuntary manslaughter charge. Specifically, Corporal [Joseph] Gober [("Corporal Gober"), a firearms examiner with the Pennsylvania State Police,] testified that the gun would not have fired unless the shooter's finger was fully on the trigger because of the safety bar on the trigger. This means that the trigger would not go to the rear, allowing the gun to fire, if it was pushed on from the sides or other indirect pressure was applied. Furthermore, the trigger requires approximately 7.2 pounds of pressure be applied for the gun to be fired. There was no evidence presented that tended to show [Mineo]'s death was the result of an accident caused by [Rogers], and there was no evidence presented that tended to show [Rogers] acted with recklessness or with gross negligence in causing the death of [Mineo]. Thus, th[e trial c]ourt did not err in refusing to charge the jury on involuntary manslaughter as a potential verdict.

Trial Court Opinion, 9/20/19, at 6-7 (citations to record omitted).

We discern no abuse of discretion in the trial court's decision not to provide the jury with involuntary manslaughter instructions, as the record does not reflect that the evidence presented at trial would have reasonably supported such a verdict. *See Banks*, *supra*. Accordingly, we can grant Rogers no relief on this claim.

In her second issue, Rogers argues that the trial court abused its discretion in denying her Motion to suppress the statements Rogers made to

police on the night of the shooting. Brief for Appellant at 15-24. Rogers claims that she was highly emotional and lacked proper sleep during the hours-long interviews with police, and she and Mineo had been drinking for hours prior to the shooting. *Id.* at 16. Though Rogers concedes that she signed a waiver of her *Miranda* rights, she argues that such waiver was not "free and unconstrained," as her emotional distress from the shooting and other circumstances rendered her incapable of overcoming the coercion placed upon her by police. *Id.* at 16-20. Finally, Rogers claims that "[n]o one in [her] mental and emotional state could have formed the requisite mindset required to overcome the coercive nature of an in-custody interrogation and voluntarily make a statement to police." *Id.* at 24.

> Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct.
>
> > [W]e may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts.

*Commonwealth v. Williams*, 941 A.2d 14, 26-27 (Pa. Super. 2008) (*en banc*) (internal citations and quotation marks omitted). "It is within the suppression court's sole province as factfinder to pass on the credibility of

witnesses and the weight to be given their testimony." ***Commonwealth v.***

***Clemens***, 66 A.3d 373, 378 (Pa. Super. 2013).

Furthermore,

[w]hen determining the validity of a ***Miranda*** waiver, we employ a two-step inquiry. We first ask whether the waiver was voluntary in the sense of being the result of an intentional choice on the part of a defendant who was not subject to undue government pressure. If we conclude the waiver was voluntary, we then ask if the defendant was aware of the nature of the choice that he made by giving up his ***Miranda*** rights, *i.e.*, whether it was knowing and intelligent.

***Commonwealth v. Knox***, 219 A.3d 186, 193-94 (Pa. Super. 2019) (internal

citations omitted).

Regarding its denial of Rogers's suppression Motion, the trial court

stated the following:

Detective Bohrman read [Rogers] her ***Miranda*** warnings upon arrival at PMRPD, [Rogers] indicated that she understood her rights, and [Rogers] executed a written waiver of the same prior to questioning at 5:00 a[.]m[.] [Rogers] had not previously disclosed her bipolar disorder diagnosis to law enforcement, nor did she make any such disclosure to Detective Bohrman when she waived her ***Miranda*** rights. [Rogers] revealed her mental health diagnosis two hours later when asked why she had been discharged from military service. When asked if she took medication for her bipolar disorder on a regular basis, [Rogers] responded that she did take medication, but that she sometimes skips a few days. There was no further discussion of [Rogers]'s mental health diagnosis during the interrogation.

At the hearing on [Rogers]'s Motion, Detective Bohrman testified credibly regarding [Rogers]'s bipolar disorder…[.] Other information gleaned from [Rogers] during her interview with Detectives Bohrman and Bray prior to arrest was that [Rogers] had eaten dinner and imbibed two alcoholic beverages between 8:00 and 11:00 p[.]m[.] on July 14, 2017, that [Rogers] did not have a history of drug use, that [Rogers] was not currently under

the influence of drugs or alcohol, that [Rogers] graduated from high school, and that [Rogers] had been a member of the United States Army for eight years. At the hearing on [Rogers]'s Motion, Detective Bohrman testified credibly regarding [Rogers]'s alleged intoxication…[.]

After being informed that [Rogers] was under arrest, Detective Bohrman read [Rogers] her *Miranda* warnings a second time, [Rogers] indicated that she understood those rights, and she executed a second waiver of the same. When asked if she wanted to continue talking, [Rogers] indicated that she no longer wished to speak to Detective Bohrman. However, after [Rogers] was advised of the next steps in the process and was told that Detective Bohrman would be sitting at his desk if she would like to tell him anything, [Rogers] made additional incriminating statements to Detective Bohrman and later Detective Bray.

Overall, [Rogers] was detained for approximately seven[-]and[-]a[-]half hours. During that time [Rogers] was provided water, offered additional beverages and food, and utilized the restroom a number of times. In total, accounting for breaks, [Rogers] was interviewed for a total of 166 minutes, just over two[-]and[-]three-fourths hours.

* * *

[] We find that, given the totality of the circumstances, each *Miranda* waiver executed by [Rogers] on July 15, 2017[,] was voluntarily, knowingly, and intelligently made. The record before us is devoid of any evidence of police coercion, intimidation, or deception in the form of promises [or] threats at any time during the interrogation. [Rogers] was detained for seven[-]and[-]a[-]half hours, during which she was questioned for two[-]and[-]three-fourths hours, provided water, utilized the restroom, and took several breaks. There is no evidence to suggest that the conditions of the interrogation room were out of the ordinary. Detectives Bray and Bohrman conducted a question and answer style interrogation, and maintained a respectful tenor and attitude throughout the interrogation. While [Rogers]'s bipolar disorder diagnosis is a factor for consideration, there is no evidence that her mental illness impacted Detective Bray or Bohrman's conduct, or that her mental illness [a]ffected [Rogers]'s ability to understand the nature of her rights or the consequences of her decision to abandon them. Additionally, there was no evidence to suggest that [Rogers] was under the influence of drugs or alcohol

at the time she executed her waivers. As such, both prongs of the **Miranda** waiver test are satisfied, and the Commonwealth has proven by a preponderance of the evidence that [Rogers]'s **Miranda** waivers were voluntarily, intelligently, and knowingly made.

As to [Rogers]'s second argument, that regardless of the voluntariness of her **Miranda** waiver, given her bipolar disorder, the circumstances of the interrogation were so coercive that any statements she made were inherently involuntary, [w]e disagree. Having already discussed the totality of the circumstances surrounding the entirety of the interrogation, we rely on that discussion above. As there is no evidence to suggest that Detectives Bray or Bohrman conducted themselves in a coercive, threatening, or otherwise intimidating manner, and that [Rogers] understood her rights, was afforded several opportunities to invoke those rights, and voluntarily, intelligently, and knowingly waived same on two separate occasions, [Rogers]'s argument is without merit. As such, the circumstances surrounding [Rogers]'s interrogation were not so coercive that her July 15, 2017[,] statements were involuntary.

Trial Court Opinion, 8/16/18, at 7-12 (citations to record omitted).

We will not disturb the trial court's credibility determinations. **See Clemens**, **supra**. The record supports the suppression court's determination that Rogers's knowingly, intelligently, and voluntarily waived her **Miranda** rights. **See Knox**, **supra**. Accordingly, the trial court did not err in denying Rogers's suppression Motion. **See Williams**, **supra**.

In her third issue, Rogers argues that her sentence of fifteen to forty years in prison was excessive, as the trial court did not give sufficient consideration to Rogers's military service, and her diagnosis for bi-polar disorder. Brief for Appellant at 25. While Rogers acknowledges that she was sentenced within the standard range, Rogers claims that she lacked the

- 10 -

capacity to appreciate her actions because of her alcohol consumption, her bi-polar disorder, and the nature of her relationship with Mineo. *Id.* at 25-26. Had the trial court properly weighed these mitigating factors, Rogers asserts, it should have imposed a lesser sentence. *Id.* at 26.

Rogers challenges the discretionary aspects of her sentence, from which there is no automatic right to appeal. *See Commonwealth v. Allen*, 24 A.3d 1058, 1064 (Pa. Super. 2011). An appellant challenging the discretionary aspects of sentence must first invoke this Court's jurisdiction by satisfying a four-part test to determine

> (1) whether the appeal is timely; (2) whether [a]ppellant preserved his issue; (3) whether [a]ppellant's brief includes a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of sentence; and (4) whether the concise statement raises a substantial question that the sentence is appropriate under the sentencing code.

*Commonwealth v. Carrillo-Diaz*, 64 A.3d 722, 725 (Pa. Super. 2013) (citations omitted).

Here, Rogers filed a timely Notice of Appeal, and preserved the issue in her post-sentence Motion. Additionally, while Rogers's brief does not contain a separate Pa.R.A.P. 2119(f) statement, the Commonwealth has not objected to this omission. *See Commonwealth v. Kiesel*, 854 A.2d 530, 533 (Pa. Super. 2004) (stating that this Court may ignore the omission of a 2119(f) statement and determine whether the appellant has raised a substantial question, as long as the Commonwealth does not object to the omission). Finally, Rogers's argument that the trial court fashioned an excessive

sentence, and failed to consider mitigating factors, raises a substantial question. **See Commonwealth v. Raven**, 97 A.3d 1244, 1253 (Pa. Super. 2014) (holding that "an excessive sentence claim—in conjunction with an assertion that the court failed to consider mitigating factors—raises a substantial question.") (citation omitted). Accordingly, we will address the merits of her issue.

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

**Commonwealth v. Zirkle**, 107 A.3d 127, 132 (Pa. Super. 2014) (citation omitted).

> When imposing a sentence, a court is required to consider the particular circumstances of the offense and the character of the defendant. In considering these factors, the court should refer to the defendant's prior criminal record, age, personal characteristics and potential for rehabilitation. It must be demonstrated that the court considered the statutory factors enunciated for determination of sentencing alternatives, and the sentencing guidelines. Additionally, the court must impose a sentence which is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and the community, and the rehabilitative needs of the defendant.

**Commonwealth v. McClendon**, 589 A.2d 706, 712 (Pa. Super. 1991) (internal citations and quotation marks omitted); **see also** 42 Pa.C.S.A. § 9721(b). Further, "where a sentence is within the standard range of the

guidelines, Pennsylvania law views the sentence as appropriate under the Sentencing Code." ***Commonwealth v. Moury***, 992 A.2d 162, 171 (Pa. Super. 2010). Moreover, "where the trial court is informed by a pre-sentence report, it is presumed that the court is aware of all appropriate sentencing factors and considerations, and that where the court has been so informed, its discretion should not be disturbed." ***Commonwealth v. Downing***, 990 A.2d 788, 794 (Pa. Super. 2010) (quotation marks and citations omitted).

Here, the record reflects that the trial court considered the "unusual" circumstances of the offense, including Mineo and Rogers's involvement with a cult, the nature of their relationship, and the parties' use of alcohol and other substances on the night of the shooting. ***See*** N.T., 6/10/19, at 20-26. The record reflects that the trial court also considered Rogers's military service and mental health history, and her rehabilitative needs, as well as her statement at sentencing and her general character. ***See id.*** at 21-23. Further, the trial court considered the Sentencing Guidelines, Rogers's prior criminal history and rehabilitative needs, the seriousness of her crimes, and the protection of the public. ***Id.*** at 23-25. Thus, the trial court properly considered all the statutory factors prior to sentencing Rogers. ***See McClendon***, ***supra***.

Additionally, because the trial court had the benefit of a PSI, which the trial court expressly stated that it had reviewed, ***see*** N.T., 6/10/19, at 25 (wherein the trial court states that it had read through the "very

- 13 -

comprehensive" PSI), it is presumed that the trial court was aware of relevant information related to Rogers's character, and weighed those considerations along with any mitigating factors. *See Downing*, 990 A.2d at 794; *see also Commonwealth v. Ventura*, 975 A.2d 1128, 1135 (Pa. Super. 2009) (stating that "[t]he sentencing judge can satisfy the requirement that reasons for imposing sentence be placed on the record by indicating that he or she has been informed by the [PSI]; thus properly considering and weighing all relevant factors.") (citation omitted). Accordingly, we conclude that the trial court did not abuse its discretion in imposing a standard range sentence, and Rogers's discretionary sentencing challenge fails.

In her fourth issue, Rogers argues that the evidence was insufficient to support her conviction of third-degree murder. Brief for Appellant at 30-32. Rogers asserts that she lacked the requisite intent to kill Mineo; reasonable doubt existed as to the circumstances surrounding the shooting; and her unfamiliarity with the mechanisms of the handgun resulted in the handgun firing. *Id.*

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined

circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [trier] of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

***Commonwealth v. Smith***, 97 A.3d 782, 790 (Pa. Super. 2014) (citation omitted).

The Crimes Code defines third-degree murder as any killing with malice that is not first- or second-degree murder. ***See*** 18 Pa.C.S.A. § 2502(c); ***see also Commonwealth v. Baskerville***, 681 A.2d 195, 199-200 (Pa. Super. 1996).

Malice consists of a "wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not intended to be injured…." Malice may be found where the defendant consciously disregarded an unjustified and extremely high risk that his actions might cause serious bodily injury.

***Commonwealth v. DiStefano***, 782 A.2d 574, 582 (Pa. Super. 2001) (citation and brackets omitted). "[M]alice can be inferred from the use of a deadly weapon upon a vital part of the victim's body." ***Commonwealth v. Thomas***, 54 A.3d 332, 335-36 (Pa. 2012).

The trial court, in its Opinion, addressed the merits of Rogers's sufficiency claim as follows:

[Rogers] fired the shot that killed [] Mineo. Indeed, she confessed, in detail to [D]etectives [] Bray and [] Bohrman of the P[MRPD]. Additionally, [Rogers] demonstrated to the detectives exactly how she was standing over Mineo while holding the gun to

- 15 -

Mineo's head. The evidence also showed that [Rogers] was the only other person in the room with Mineo at the time of the shooting.

Furthermore, evidence presented by the Commonwealth directly contradicted [Rogers]'s claim that Mineo placed the gun in her hand and forced her to pull the trigger by violently pulling the barrel of the gun toward himself. First, the Commonwealth presented evidence that the gun was placed down on its left side, rather than being dropped by the shooter. Mineo's body was completely undisturbed after the shooting, which indicated that [Rogers] did not try to revive or check on Mineo or otherwise make contact with his body after the gun went off. Evidence also showed that Mineo had toxic levels of mitragynine in his system together with a BAC of .150%, which would have rendered him impaired. Moreover, Mineo was sitting on the floor in a relaxed pose with his right leg crossed over his left leg. The fatal shot was located in the center of Mineo's forehead and there were clear signs of a close contact gunshot, including burns and bruising around the entrance wound, indicating the muzzle of the gun was lightly pressed against Mineo's head at a downward trajectory. Lastly, Corporal Gober testified that if a tight or heavy pressure is applied to the muzzle area of the gun used in this case, the gun can be knocked out of battery, which is a safety feature that can prevent it from firing.

Finally, the Commonwealth presented circumstantial evidence to show [Rogers]'s intent to commit [t]hird[-d]egree [m]urder—*i.e.*[,] malice. Evidence was presented at trial that showed [Rogers] and Mineo had a tumultuous relationship in the weeks leading up to the shooting. Indeed, the evidence showed that [Rogers] and Mineo were part of a "religious" group, led by Sherry Shriner. There was evidence that this group was, in fact, more like a cult and that Shriner had immense control over the majority of her devotees, including Mineo. Approximately [two] months before the shooting, Shriner began attacking [Rogers] online, claiming that [Rogers] was one of the group's enemies (specifically, a "reptile") and insinuating that Mineo should no longer be in a relationship with [Rogers]. In addition to this ongoing confrontation, the Commonwealth presented evidence that Mineo was financially dependent on [Rogers], and that Mineo suspected [that Rogers] was cheating.

The above evidence, viewed in the light most favorable to the Commonwealth, established beyond a reasonable doubt, albeit circumstantially, that [Rogers] was holding the gun to Mineo's forehead and pulled the trigger, committing murder. The Commonwealth presented evidence that [Rogers] was the only person in the home at the time of the fatal shooting. The Commonwealth also presented evidence that Mineo suffered from a contact gunshot wound to the middle of his forehead and that his sitting posture and the gun's placement after the shooting belied any type of self-inflicted gunshot wound or a sequence of events that involved Mineo's hands on the gun when it was fired. Accordingly, evidence shows that [Rogers] used a deadly weapon—a gun—on a vital part of Mineo's body—his head. As we instructed the jury, this act alone can be used by the finder of fact to infer malice. In addition to this permissible inference of malice, the Commonwealth also presented evidence to show that intent in that [Rogers] and Mineo's relationship had become increasingly contentious due to accusations about [Rogers] from Mineo's "religious leader" and Mineo's financial dependence on [Rogers]. Finally, and in accordance with the physical evidence at the scene, [Rogers] herself admitted to shooting Mineo and demonstrated a shooting stance that would have resulted in the same type of wound that killed Mineo.

Trial Court Opinion, 12/10/19, at 3-6 (citations to record omitted).

We agree with the sound analysis of the trial court, and adopt its analysis herein. **See id.** Accordingly, Rogers is not entitled to relief on this claim. **See Smith**, **supra**.

In her fifth issue, Rogers argues that the verdict was against the weight of the evidence. Brief for Appellant at 27-29. Rogers claims that she lacked the requisite intent to kill Mineo, and that her inconsistent statements to police were due to the "tunnel vision" she was experiencing after just having witnessed Mineo's death. **Id.** at 27. According to Rogers, she did not believe that the handgun would fire because her experience with revolvers provided

her with an inaccurate impression of the trigger pressure necessary to fire the handgun. *Id.* at 28. Further, Rogers points to the possibility that Mineo's hands were on top of the handgun as it fired. *Id.* In light of the above factors, Rogers asserts that the verdict shocks the conscience. *Id.* at 28-29.

> The law pertaining to weight of the evidence claims is well-settled. The weight of the evidence is a matter exclusively for the finder of fact, who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. A new trial is not warranted because of a mere conflict in the testimony and must have a stronger foundation than a reassessment of the credibility of witnesses. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. On appeal, our purview is extremely limited and is confined to whether the trial court abused its discretion in finding that the jury verdict did not shock its conscience. Thus, appellate review of a weight claim consists of a review of the trial court's exercise of discretion, not a review of the underlying question of whether the verdict is against the weight of the evidence.

*Commonwealth v. Gonzalez*, 109 A.3d 711, 723 (Pa. Super. 2015) (quotation marks and citations omitted).

The trial court ably addressed Rogers's weight of the evidence claim as follows:

> In this case, there was never any question whether [Rogers] fired the fatal shot. [Rogers] placed the call to 911 and stated to the dispatcher that she shot [Mineo] in the head and also told the responding officer, [Cpl.] Mertz, that [Mineo] placed the gun to his own head, then she pulled the trigger and [Mineo] collapsed onto the floor. Later, during an interview with [Detective] Bray and [Detective] Bohrman from the P[MRPD], [Rogers] confessed to the murder in very specific detail. Additionally, [Rogers] demonstrated to the detectives exactly how she was standing over [Mineo] while holding the gun to [Mineo]'s head. The evidence

- 18 -

also showed that [Rogers] was the only other person in the room with [Mineo] at the time of the shooting.

Furthermore, at trial, the Commonwealth presented evidence from the crime scene that showed the following: [t]he gun was placed down on its left side, rather than being dropped by the shooter. [Mineo]'s body was completely undisturbed after the shooting, which indicated that [Rogers] did not try to revive or even check on [Mineo]. Evidence also showed that [Mineo] had toxic levels of mitragynine in his system together with a BAC of .150%, which would have rendered him impaired. [Rogers]'s claim that [Mineo] placed the gun in her hand and forced her to pull the trigger by violently pulling the barrel of the gun toward himself is also belied by the way [Mineo] was sitting at the time of the fatal shot. Specifically, [Mineo] was sitting on the floor in a relaxed pose with his right leg crossed over his left leg. The fatal shot was located in the center of [Mineo]'s forehead and there were clear signs of a close contact gunshot, including burns and bruising around the entrance wound, indicating the muzzle of the gun was lightly pressed against [Mineo]'s head at a downward trajectory. Further, Corporal Gober testified that if a tight or heavy pressure is applied to the muzzle area of the gun used in this case, the gun can be knocked out of battery, which is a safety feature that can prevent it from firing.

Trial Court Opinion, 9/20/19, at 4-5 (citations to record omitted).

Our review of the record confirms that the trial court did not abuse its discretion when it concluded that the jury's verdict was not against the weight of the evidence. *See Gonzalez*, *supra*. Discerning no abuse of discretion by the trial court, this claim fails.

Judgment of sentence affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*


*Date: 2/23/2021*